Justice HECHT
delivered the opinion of the Court, in which
Justice WAINWRIGHT, Justice MEDINA, Justice GREEN, and Justice GUZMAN joined, and in Parts I and III of which Justice JOHNSON joined.
The parties dispute whether an “all risk” property damage insurance policy provides indemnity for certain expenses incurred in connection with a covered loss. Coverage was negotiated in the London market, and as is customary there, the parties reached agreement by lining through provisions in a form policy. One such provision would have required reimbursement of the disputed expenses, and the question is whether the strike-through reflects the parties’ intention that those expenses would not be reimbursed. We agree with the court of appeals that the answer is yes.[1] Deletions from a draft agreement do not always indicate the parties’ intent, but they do when, as here, they are part of the customary negotiation process.
I
In 2002, Offshore Specialty Fabricators, Inc. agreed to construct a drilling platform in the Gulf of Mexico for The Houston Exploration Company. Their contract required Offshore to obtain builder’s risk insurance naming Houston as an additional insured. Offshore contacted a local broker, Greg Lary at Lary Insurance Services, Inc., who turned to Lloyd’s of London for the insurance.
“Lloyd’s began as a coffee house but has developed into one of the world’s leading markets for insurance. This market, however, operates in accordance with age-old customs that are, to say the least, unusual in American business law.”[2] Houston cites an opinion by Judge John Rainey as “[a] good description of the Lloyd’s operation” [3] at the time the policy in this case issued:
Lloyd’s London (“Lloyd’s”) is a 300-year-old market in which individual and corporate underwriters, known as Names, underwrite insurance. Lloyd’s itself is not an insurance company; it merely provides the physical premises and administrative staff and services to enable the actual underwriters to carry on their business. To increase efficiency *465 and multiply resources, Names have joined together to form syndicates, of which there are now more than four hundred; a particular syndicate may have a few hundred or several thousand Names. Syndicates have no legal existence apart from the Names, and syndicates neither assume liability nor underwrite risks. Within each syndicate, an “active” underwriter is authorized to determine the conditions to which a risk will be subject, the percentage of risk to be assumed by the syndicate on behalf of the Names, and the percentage of risk each Name in the syndicate will assume. Thus, when the active underwriter accepts a percentage of the risk, he binds every Name in the syndicate. Each Name assumes unlimited liability for his share of the syndicate’s losses, but he is liable for no other portion assumed by any other Name.
Only approved brokers are permitted to place risks with Lloyd’s underwriters. Typically, a broker will prepare the “slip,” a summary of the details of the risk the broker is seeking to insure (or reinsure). The broker and the active underwriter proceed to negotiate the terms and premium, indicating as much on the slip itself. The underwriter who structures the transaction with the broker is known as the “lead” underwriter; the lead underwriter’s syndicate is known as the “market lead” or “leader of the market” for that particular risk. When the underwriter signs (or “scratches”) the slip, a binding contract between his syndicate and the insured is formed. Having obtained the signature of the lead underwriter, the broker retains the slip and approaches other syndicates or insurance companies to secure coverage for the remaining risk. Once the broker has succeeded in procuring full coverage, he retains the slip and provides subscribing underwriters with copies of the terms and conditions of the coverage. If a claim under the insurance (or reinsurance) agreement is not outstanding, an underwriter may agree to waive issuance of a policy; the slip is then signed “on risk.” Otherwise, the broker’s policy department prepares the policy and forwards it to the Lloyd’s Policy Signing Office (“LPSO”). The LPSO checks the policy against the slip to ensure that the policy contains all the terms and conditions of the slip. If no inconsistencies are discovered, the policy issues, often long after the initial signing of the slip.[4]
As required by Lloyd’s, Lary requested an approved London broker, Tysers International Insurance & Reinsurance Brokers, to obtain insurance for Offshore and Houston (“the Assureds”). Tysers negotiated with respondent Wellington Underwriting Agencies Limited as lead for a group of underwriters (“the Underwriters”).[5] Tysers and Wellington worked *466 from a 33-page “WELCAR 2001 Offshore Construction Project Policy” form, lining through several provisions. The form contained two parts labeled “Section I-Physical Damage” and “Section II-Liability”. Tysers and Wellington lined through all seven pages of Section II, which provided liability insurance. “Subject to the [policy’s] terms, conditions and exclusions”, Section I “insure[d] against all risks of physical loss of and/or physical damage to [covered] property” — that is, property involved in any project undertaken by Offshore and declared under the policy.[6] Offshore’s Houston project was part of the declaration, and others could be added as they were undertaken.
The policy terms provided that the Underwriters would indemnify the Assureds for “costs necessarily incurred and duly justified in repair or replacement” of lost or damaged property (¶ 1 a). The cost of hiring vessels, equipment, and labor “used in or about the repair ... of losses covered by Section I” was also recoverable, as was a reasonable charge for Offshore’s “util-ising]” its own equipment (¶ 1 d). Other provisions required payment for loss due to governmental action to prevent pollution (¶ 6); certain defective parts (¶ 7); certain salvage charges (¶8); and wreckage removal (¶ 11). But five provisions calling for reimbursement of other expenses associated with covered losses were struck through:
• ¶ 10, “Additional Work”, providing payment for additional work needed to reposition a structure;[7]
• ¶ 12, “Tests, Leak and/or Damage Search Costs”, providing payment for tests required to be repeated after a covered occurrence;[8]
*467 • ¶ 13, “Stand-By Charges”, providing payment for the cost of keeping equipment engaged in repairing a covered occurrence available through delays for bad weather;[9]
• ¶ 16, “Terrorist ‘Buy Back’ Clause”, providing payment of some losses due to terrorism;[10] and
• ¶ 17, “Forwarding Charges”, providing payment for costs due to interruptions in transporting property as part of a covered occurrence.[11]
Following these terms were almost two pages of exclusions. As altered,[12] the form became the policy to which Tysers and the Underwriters agreed, and Tysers notified Lary that coverage had been bound.[13]
A few weeks later, the drilling platform Offshore was constructing for Houston became unstable, requiring immediate repairs. But work was delayed by severe storms in the Gulf, during which Offshore kept repair vessels standing by so that they could resume repairs as soon as the weather improved. The Assureds submitted a claim for $3,256,174, which included about $1 million for weather stand-by charges. The Underwriters paid $2,034,961, acknowledging that the platform damage was a covered occurrence, but refused to pay for the weather standby charges. Paragraph 13, which was struck through in the policy, would have required indemnity for those charges.
The Assureds sued the Underwriters on the policy, and the Underwriters counter *468 claimed, alleging that the Assureds had submitted a false claim. The trial court granted partial summary judgment for the Assureds, construing the policy to require payment of the weather stand-by charges. In its order, the trial court gave this explanation of its ruling
The Court, having disregarded the stricken policy language as parol evidence, found the Policy to be unambiguous in favor of coverage. The Policy is only ambiguous if the stricken language is read into the Policy, and then treated as an exclusion. The stricken language is parol evidence that creates an ambiguity, necessitating further parol evidence. Whereas parol evidence may be used to interpret an ambiguous contract, it cannot be used to create an ambiguity. By ignoring the stricken language and treating it as never having been in the policy (as is the case when only looking at the four corners of the Policy), the contract is unambiguous.
(Emphasis in original.) Later, the trial court signed an agreed order for an interlocutory appeal on two questions:
(1) Whether the Welcar 2001 Offshore Construction Project policy of insurance at issue herein provided coverage for the weather standby charges incurred by Houston Exploration which are the subject of suit herein;
(2) If coverage exists for weather standby [charges], whether Underwriters’ counterclaims for fraud and breach of contract are without merit.
The trial court found these were “controlling questions of law as to which there is substantial ground for difference of opinion”, and that “an immediate interlocutory appeal ... will materially advance the ultimate termination of this litigation”.[14]
The court of appeals answered the first question no, thereby mooting the second question.[15] The court began by noting that Section I’s broad provision of insurance against “all risks” is expressly “subject[ ] ... to ‘the [policy’s] terms’ ”, which require reimbursement of only certain repair costs.[16] Those include “costs ‘necessarily incurred ... in repair’ ” of damaged property.[17] But according to the evidence, weather stand-by charges are justified only in limited circumstances, when repairs are required to be made immediately, and thus, the court reasoned, are not “necessarily incurred” in making repairs.[18] Nor, the court continued, are charges for equipment and laborers being “ ‘used in or about the repair’ ” of losses, as required by another policy term, while standing by, doing nothing, waiting for the weather to improve.[19] The court further reasoned that the inclusion of paragraph 13 among the terms in the form policy, specifically *469 requiring reimbursement of weather stand-by charges, indicates that such charges would not be reimbursable under other form policy provisions.[20] Relying on a decision of this Court, the court of appeals held that “deletions remaining within an insurance policy can'be considered in construing an unambiguous insurance policy.” [21] By striking out paragraph 13, the court concluded, the parties must have intended that weather stand-by charges not be reimbursable.[22]
We initially denied the Assureds’ petitions for review[23] but granted them on rehearing.[24]
II
A written contract must be construed to give effect to the parties’ intent expressed in the text as understood in light of the facts and circumstances surrounding the contract’s execution, subject to the parol evidence rule.[25] The parol evidence rule applies when parties have a valid, integrated written agreement, and precludes enforcement of prior or contemporaneous agreements.[26] The rule does not prohibit consideration of surrounding circumstances that inform, rather than vary from or contradict, the contract text. Those circumstances include, according to Professor Williston’s treatise, “the commercial or other setting in which the contract was negotiated and other objectively determinable factors that give a context to the transaction between the parties.”[27]
As we have said, “[negotiations of the parties may have some relevance in ascertaining the dominant purpose and intent of the parties embodied in the contract inter *470 preted as a whole”.[28] The manner in which the insurance policy in this case was negotiated in the London market is crucial to understanding its terms. The parties did not create the policy text; rather, they began with a form policy that covered “all risks” of property damage, subject to a laundry list of terms that provided for reimbursement of different kinds of costs that might be incurred in connection with a covered loss. They did not edit the policy language, but they did strike through several provisions requiring payment of particular costs, including the cost of certain additional work and testing, certain transportation costs, losses due to terrorism, and weather stand-by charges. The remaining provisions required payment of other costs. The parties followed the customary process for negotiating an insurance policy in the London market.
The Assureds argue that by deleting requirements that specific kinds of costs be reimbursed, the parties did not intend that the costs not be reimbursed. Rather, they contend, the deletions are completely irrelevant, and the policy must be construed as if the struck-through provisions had not been included in the form in the first place. This not only ignores but distorts the negotiation process. The parties did not try to write a policy from scratch. They took an existing form, deleted some payment requirements and kept others. The purpose of the process was to decide both what costs would be paid by the policy and what costs would not be paid. To see the deletions as irrelevant blinks reality.
We have twice held that deletions in a printed form agreement are indicative of the parties’ intent. In Gibson v. Turner, lessors leased all the minerals in 922 acres, even though they owned only an undivided 9/40ths.[29] The lessee knew this because he was already lessee of the other 31/40ths.[30] The printed form lease in common use called for a l/8th royalty on production “from said land”.[31] Following the royalty clause was a proportionate reduction clause.[32] This standard provision in mineral leases provided that if the lessor owned less than all of the mineral interest in the property described, the royalty would be reduced proportionately.[33] The clause had been typed over with x’s.[34] We held that the lease entitled the lessors to a l/8th royalty on total production from the 922 acres, not 9/40ths of l/8th.[35] We expressly rejected the lessee’s contention “that the fact that the proportionate reduction clause was stricken from the lease cannot be considered in construing the meaning of the royalty reservation”.[36] The deletion showed, not merely that the parties had not reached agreement on the subject, but that “the parties to the lease at the time of its execution did not limit the royalty provision to l/8th of 9/40ths of the production — the interest owned by the *471 lessors in the minerals”.[37] This, we said, was consistent with provisions of the lease calling for the lessors to be paid only 9/40ths of the bonus and delay rental.[38] When the parties intended the lessors’ entitlements to be based on their partial ownership, they expressed it clearly.[39]
In Houston Pipe Line Co. v. Dwyer, landowners claimed that a natural gas pipeline easement had terminated when the defendant removed the existing pipeline and replaced it with a larger one to meet increased demand.[40] The printed form easement granted “a right of way to lay, maintain, operate, repair and remove a Pipe Line for the transportation of gas”, but the parties lined through the words, “and remove”.[41] They added a provision that authorized removal of the pipeline on termination of the easement.[42] And they lined through a paragraph granting the right to construct additional pipelines.[43] The landowners contended, and we agreed, that “[t]he deletions made by the parties ... may be considered ... in order to arrive at the true meaning and intention of the parties.”[44] They argued that by deleting “and remove” while adding authorization for removal at termination, the parties intended to prohibit any removal of the pipeline except at termination.[45] The defendant countered that the deletion could not be construed to prohibit the removal and replacement of the original pipe when the pipe’s condition required replacement.[46] We held that the right to “operate” and “maintain” a pipeline was broad enough to authorize its replacement in the existing location with pipeline of the same size, but not broad enough to authorize replacement “with a line of substantially greater size.”[47]
Gibson and Dtuyer establish that deletions in a printed form agreement must be considered in construing the other provisions.[48] The import of a deletion may be clear, as it was in Gibson, or less so, as in Dwyer, but in neither case can it be ignored. The Assureds contend that the parties’ intent in deleting paragraph 13 requiring reimbursement of weather stand-by charges is unclear. It may have been, they argue, because the provision was surplusage, redundant of other, more general provisions, like the “all risks” provision, the “costs necessarily incurred” provision in paragraph la, and the “used in or about” provision in paragraph Id. This argument ignores the structure of the form policy, which was to provide coverage for “all risks” subject to specific terms, *472 followed by a list of terms addressed to specific kinds of costs. There is no reason to think that paragraph 13 was any more surplusage than the other four paragraphs that were struck through, so that provision after provision was redundant, or any less surplusage than the paragraphs that remained, so that only the five struck were unnecessary. The Assureds argue that the parties may have deleted paragraph 13 so that weather stand-by charges would be fully reimbursable, rather than capped as permitted by the provision. But the way to delete the cap was to strike the introductory phrase, “[sjubject to a sub-limit of US$(AMOUNT)”, not to strike the remainder of the paragraph requiring payment.
The Assureds argue that deletions in a printed form should be treated no differently than deletions in a draft, all evidence of which is omitted from the final agreement. But the law has long recognized that changes in a printed form must be accorded special weight in construing the instrument. The Uniform Commercial Code, for example, provides that handwritten and typewritten terms prevail over contradictory printed terms.[49] Professor Williston’s treatise states that this is the rule generally.[50] It may be that deletions in drafts indicate the parties’ intent in the final agreement, but we need not decide that issue here.
We conclude that the effect of the deletion of paragraph 13 was to remove weather stand-by charges from the costs for which the policy provided indemnity.
Ill
The Assureds contend that indemnification for weather stand-by charges is required by policy provisions other than paragraph 13, and that if the deletion of that paragraph is construed as an exclusion, then its effect must be “strictly construed against the insurer and in favor of the insured.”[51] We agree that strict construction is required, but the effect of the exclusion is the same.
The Assureds argue that payment of weather stand-by charges is required by the policy’s general provision that “insures against all risks of physical loss of and/or physical damage to [covered] property”. But that provision is expressly “[s]ubject to the terms” that follow in the policy, one of which would have been paragraph 13. Treating its deletion as an exclusion makes it an express exception to the general “all risks” insurance provision.
The Assureds argue that weather stand-by charges are “costs necessarily incurred and duly justified in repair or replacement” of lost or damaged property, which must be paid under paragraph la. But weather stand-by charges are not nec *473 essarily incurred in repairing property damage; they are optional. The Assureds could have released vessels and labor until the storms that delayed repairs passed. Their retention may have been prudent and cost-effective, as the Assureds argue, but the charges incurred were no more necessary than those for repositioning a structure, repeating tests, losses from terrorism, and transportation interruptions, all covered by other paragraphs in the same “Terms and Conditions” section that were also deleted.
The Assureds argue that weather stand-by charges are part of the costs of equipment and labor “used” or “utilise[d]” in repairing covered property under paragraph Id, but the opposite is true: the charges are for equipment and labor that are standing by, awaiting use when the weather clears. If paragraph Id covered weather stand-by charges, paragraph 13 would be surplusage in a policy in which it was not struck through, as in this policy.
Finally, the Assureds argue that because the policy provided a deductible for weather standby charges, the charges must have been payable under the policy. But the deductible provision was another part of the printed form. Having struck paragraph 13, the parties might well have struck the deductible provision, but failing to do so simply left it inoperative.
[[Image here]]
For these reasons, we conclude that the judgment of the court of appeals should be

Affirmed.

Justice JOHNSON filed a concurring opinion.
Chief Justice JEFFERSON filed a dissenting opinion, in which Justice WILLETT and Justice LEHRMANN joined.

. 267 S.W.3d 277 (Tex.App.-Houston [14th Dist.] 2008).

. E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925, 929 (2d Cir.1998) (citing Godfrey Hodgson, Lloyd's of London 49-75 (1984)).

.Brief on the Merits of Petitioner The Houston Exploration Company at 43.

. Houston Cas. Co. v. Certain Underwriters at Lloyd's London, 51 F.Supp.2d 789, 791-792 (S.D.Tex.1999), aff'd, 252 F.3d 1357 (5th Cir.2001) (footnote omitted); cf. What We Do, Lloyd’s.com, http://www.lloyds.com/Lloyds/ Investor-Relations/Lloyds-overview/What-we-do (last visited Aug.23, 2011).

. The other underwriters, also respondents, were: Syndicate 2020; Anton Private Capital Limited; CBS Private Capital Limited; Ar-genta Private Capital Limited; Syndicate 3030; Amlin Underwriting Ltd.; Syndicate 2001; Navigators Underwriting Agency Ltd.; Syndicate 1221; Marlborough Underwriting Agency Ltd.; Syndicate 1861; Managing Agency Partners Ltd.; Syndicate 2791; Hardy (Underwriting Agencies) Ltd.; Syndicate 382; Beazley Furlonge Ltd.; Syndicate 623; Houston Casualty Company; Navigators Insurance Company; AXA Corporate Solutions Reassurance-Paris; AXA Corporate Solutions IUA; AXA Corporate Solutions Insurance Company; AXA Corporate Solutions Reinsurance; AXA Corporate Solutions Lloyd's Insurance *466 Company of Texas; Commonwealth Insurance Company; International Insurance Company of Hannover Limited; and American Offshore International Syndicate.

.A section captioned "Covered Property” provided as follows:
"This insurance covers works executed anywhere in the world in the performance of all contracts relating to the Project including (provided they are included in the contract values declared to Underwriters and insured herein) materials, components, parts, machinery, fixtures, equipment and any other property destined to become a part of the completed project, or used up or consumed in the completion of the project. This insurance shall also cover (provided they are declared to and agreed by Underwriters) all temporary works, plant, equipment, machinery, materials, outfits and all property associated therewith, whether such items are intended to form a permanent part of the works or not, including site preparatory work and subsequent operational risks.
"It is understood and agreed that any insured equipment and/or property that is not for incorporation into the contract works shall be covered whilst it is being utilised in the Project and whilst in transit from the Project site(s) until the earlier of the date of arrival at its final destination or the 30th day after its removal from the Project site(s).”

. "In the event that the structure or insured property is set down or wrongly positioned, which is the direct result of a peril insured against, Underwriters shall indemnify the Assureds for the cost of additional work that is required in respect of positioning or repositioning, sinking, submerging and stabilizing the property insured herein insofar as such cost does not fall within the cover afforded by the sue and labour clause. However Underwriters' liability under this clause shall not exceed the percentage amount that would be recoverable under the sue and labour clause and then only to the extent that the Policy Limit is not exhausted by a claim under the sue and labour clause.”

. "If it becomes necessary to repeat any test(s) and/or trial(s) or to carry out subsequent test(s) and/or trial(s) as a result of a physical loss or physical damage to the insured property arising from an Occurrence covered under Section I, Underwriters will bear the cost of any such repeated and/or subsequent test(s) and/or trial(s) subject to a sub-limit of (AMOUNT) (100%) any one Occurrence, but never to exceed original expen *467 diture as identified in the latest agreed Schedule B.”

. “Subject to a sub-limit of US$ (AMOUNT) any one Occurrence aggregated at US$ (AMOUNT) over the Policy Period, Underwriters shall indemnify the Assureds for the cost of stand-by time on vessels and/or craft and/or equipment actively engaged in the course of repair following an Occurrence covered under Section I, where the Assureds are prevented from working in, around or about the damaged property by bad weather, including named hurricanes.”

. "Subject to the terms and conditions to which reference is made below, Underwriters shall indemnify the Assureds under this clause for physical loss and/or physical damage that would be recoverable under Section 1 of the Policy but for the existence of the following clause in Section I, Exclusion 2:
" 'Notwithstanding anything to the contrary contained in this section, there shall be no liability whatsoever for any loss caused by, or resulting from, or incurred as a result of: " ‘a. (i) the detonation of an explosive and/or (ii) any weapon of war[;] and is caused by any person acting maliciously or from a political motive.
" ‘b. Any act for political or terrorist purposes of any persons, and whether or not agents of a sovereign power, and whether the physical loss, damage or expense resulting therefrom is accidental or intentional'.”

. “In respect of transits) insured hereunder, if as a result of an Occurrence covered by the terms of Section I, the insured transit is terminated at a port or place other than that to which the property insured is covered under this insurance, Underwriters will reimburse the Assured for any extra charges properly and reasonably incurred in unloading, storing and forwarding the property insured to the destination to which it is insured hereunder.
"Underwriters will bear the cost of any such extra charges subject to a sub-limit of US$ (AMOUNT) (100%) any one Occurrence.”

. Tysers and the Underwriters also lined through a paragraph of the general provisions entitled "Escalation Clause”, which called for insured values to be adjusted above or below declared values to reflect final completed values, and other provisions deemed unnecessary because they related to the construction period.

. The Assureds insist that they knew nothing of the actual terms of the policy to which Tysers and the Underwriters had agreed until after this litigation commenced. Those factual disputes and others before the trial court do not prevent our resolution of the legal questions presented.

. See Tex.Civ. Prac. & Rem.Code § 51.014(d) ("A district court, county court at law, or county court may issue a written order for interlocutory appeal in a civil action not otherwise appealable under this section if: (1) the parties agree that the order involves a controlling question of law as to which there is a substantial ground for difference of opinion; (2) an immediate appeal from the order may materially advance the ultimate termination of the litigation; and (3) the parties agree to the order.”). Section 51.014(d) has been amended, effective September 1, 2011. Act of May 30, 2011, 82nd Leg., R.S., ch. 203, § 3.01, 2011 Tex. Gen. Laws -, (amendments to Tex. Civ. Prac. & Rem Code § 51.014(d)); id. § 6.01 (effective only in civil actions filed on or after effective date); id. § 6.02 (effective date).

. 267 S.W.3d 277, 288-289 (Tex.App.-Houston [14th Dist.] 2008).

. Id. at 284 (quoting the policy).

. Id. at 285 (quoting the policy).

. Id.

. Id. at 285-286 (quoting the policy).

. Id. at 288.

. Id. at 287 (citing Gibson v. Turner, 156 Tex. 289, 294 S.W.2d 781 (1956), and Westchester Fire Ins. Co. v. Stewart & Stevenson Servs., Inc., 31 S.W.3d 654 (Tex.App.-Houston [1st Dist.] 2000, pet. denied)).

. Id. at 288.

. 53 Tex.Sup.Ct.J. 15 (Oct. 23, 2009).

. 53 Tex.Sup.Ct.J. 562 (Apr. 9, 2010).

. Sun Oil Co. (Delaware) v. Madeley, 626 S.W.2d 726, 731 (Tex.1981) (" ‘It is the general rule of the law of contracts that where an unambiguous writing has been entered into between the parties, the courts will give effect to the intention of the parties as expressed or as is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is objective, not subjective, intent that controls .... Where a question relating to the construction of a contract is presented, as here, we are to take the wording of the instrument, considering the same in the light of the surrounding circumstances, and apply the pertinent rules of construction thereto and thus settle the meaning of the contract.’ ... If, in the light of surrounding circumstances, file language of the contract appears to be capable of only a single meaning, the court can then confine itself to the writing. Consideration of the facts and circumstances surrounding the execution of a contract, however, is simply an aid in the construction of the contract’s language. There are limits. For example, when interpreting an integrated writing, the parol evidence rule circumscribes the use of extrinsic evidence.” (quoting City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518-519 (Tex.1968)) (emphasis removed)).

. Hubacek v. Ennis State Bank, 159 Tex. 166, 317 S.W.2d 30, 32 (1958) ("When parties have concluded a valid integrated agreement with respect to a particular subject matter, the rule precludes the enforcement of inconsistent prior or contemporaneous agreements.”); see generally Restatement (Second) of Contracts (1981) § 213("(1) A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them. (2) A binding completely integrated agreement discharges prior agreements to the extent that they are within its scope.”).

. 11 Richard A. Lord, Williston on Contracts § 32.7 (4th ed. 1999).

. Tanner Dev. Co. v. Ferguson, 561 S.W.2d 777, 781 (Tex.1977); see generally Restatement (Second) of Contracts § 214 ("negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish ... (c) the meaning of the writing, whether or not integrated”).

. 156 Tex. 289, 294 S.W.2d 781, 782 (1956).

. Id. at 782-783.

. Id. at 783.

. Id. at 782.

. See McMahon v. Christmann, 157 Tex. 403, 303 S.W.2d 341, 343 (1957).

. Gibson, 294 S.W.2d at 782.

. Id. at 785.

. Id.

. Id.

. Id.

. Id.

. 374 S.W.2d 662, 663 (Tex.1964).

. Id. (emphasis removed).

. Id.

. Id.

. Id. at 664.

. Id.

. Id.

. Id. at 664-666.

. See generally 11 Richard A. Lord, Williston on Contracts § 32.13 (4th ed. 1999) (“The rule that added or modified provisions control over printed provisions plainly applies to instances of interlineations or to the striking of a printed portion and the addition of another term. Indeed, deletions made without concomitant additions or substitutions may be considered in order to ascertain the parties' intent, for the deletion alone, even without replacement, clearly manifests an unwillingness to be bound according to the deleted terms, although it may not express to what terms a party would be willing to be bound.” (footnote omitted)).

. Tex. Bus. & Com.Code § 3.114 ("If an instrument contains contradictory terms, typewritten terms prevail over printed terms, handwritten terms prevail over both, and words prevail over numbers.”).

. 11 Richard A. Lord, Williston on Contracts § 32.13 ("Even though the parties will often begin with a preprinted or standard form contract, they will sometimes make additions to or changes in their printed contract, adopting it to their particular transaction. Typically, such changes or additions will be handwritten but they may also be typed or stamped. In accord with the general rule that all parts of a contract are to be given effect, the courts must seek to reconcile inconsistencies between the changed or added terms and the printed matter. Where, however, the printed contract provisions irreconcilably conflict with the provisions added by the parties, the added provisions will control." (footnote omitted)).

. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., 811 S.W.2d 552, 555 (Tex.1991).